When you're ready, Mr. Lester. It's a crowded room today, Your Honor. May it please the court. This is another one of the spent nuclear fuel cases that the court has heard several arguments on in the past, since January. The three issues, the government has appealed three specific issues in this case. We are not contesting liability for the bulk of the damages, but there are three specific issues which the trial court here used to increase the damages award that we have appealed. Just for clarity, I just want to go through the three issues and identify all three of these have been argued in other cases that are before the court, and just so the record is clear, I want to just, for the court's convenience, to identify what they are. The exchanges issue that is at play here was argued last month in the Pacific Gas case, although there is a mandate rule issue that precedes the court's, whether the court will actually decide exchanges in that case. The private fuel storage investment issue, in addition to Indiana-Michigan, which this court decided in 2005, that issue is still live in the PG&E case, which was argued last month. Also, though, there's a mandate rule issue that precedes the court's merits determination on that. And that issue will also be argued this afternoon in the Northern States case before a two o'clock panel. And then finally, the overheads issue here, it was argued in several of the SNF cases, most recently last month in Southern California-Edison, where overheads is the only issue on appeal there. So, I would like to start with the PFS issue only because there is an extra issue at play there that is not, will not be discussed in either PG&E or Northern States. And all three of these issues, as the court may be aware, are fairly significant to the SNF litigation. They are being raised repeatedly below, and so this court's guidance will be helpful. With the PFS issue, the extra issue here is the manner in which the PFS investment was made, and the trial court's decision to allow Dairyland to recover an investment that a subsidiary of Dairyland made into PFS. Dairyland itself did not invest in PFS, and the trial court found that because of, for taxes. What exactly is the difference between the amount, in the numbers, between Dairyland's investment in GFT and the GFT investment in PFS? I don't think there's a lot of difference, except from the standpoint that what happened was Dairyland gives money to GFT, which then issues shares of stock to Dairyland, which Dairyland still possesses. Then GFT invests in PFS. If any profits are made from PFS, then they go to GFT rather than to Dairyland, and Dairyland set it up this way so it would not, its tax structure is such that it can't really make profits like this. So your problem is... Didn't Wisconsin require them to set up the GFT, Genoa? No, this was Dairyland's decision to do it this way to avoid, as the trial court found, the tax consequences and to protect itself against liability. So there is a specific corporate structure here. So your issue is that there's an unjust enrichment problem. Well, our issue is that, in fact, as this court has recognized in numerous cases, most recently in American Capital and Southern California Federal, this court has strictly observed the corporate forms before in past cases. Here, Dairyland set up a subsidiary for a reason. It did not want to invest in GFT itself, or in PFS itself. It set up a subsidiary, and the subsidiary did that. Because of the corporate structure, the way that it was set up, Dairyland didn't actually invest in PFS. Now, if Dairyland had wanted to say, well, the damages that Dairyland potentially could have would be if the value of its shares in GFT were affected somehow by the breach. Because that's what Dairyland owns. That's what Dairyland did. But it didn't argue that. It didn't present any evidence that, in fact, the value of the shares was somehow affected by the government's breach. So you're saying they can't collect because of this corporate structure issue? Exactly, Your Honor. I mean, they set this up so that they actually wouldn't be liable to anyone for the investment. If their third parties sue GFT, or sue somehow GFT because it's an investment, Dairyland has protected itself to take the benefits of the corporate form, but then step out of the corporate form when it finds it beneficial. GFT is a wholly owned subsidiary. It is. Yes, it is, Your Honor. Isn't this a pretty reasonable and foreseeable sort of action that they would take to mitigate the damage you're imposing on them? Well, even the trial court found that the decision to create the subsidiary was not foreseeable to the government at the time. And I don't think that trial court decision has been challenged on appeal. But, you know, stepping past that into whether or not PFS itself was foreseeable, I mean, what we have, you know, what would be, I think, the issue with foreseeability as the, it's not just whether or not somebody could, you know, maybe- I think what he said was that he wouldn't give them as foreseeable the cost of setting up Genoa. But he said it was clearly foreseeable that they would have to somehow store the spent fuel and those storage costs through Genoa is all that he gives them. And that gets to the merits issue, Your Honor. Then the issue is whether or not should DOE have foreseen at the time of contract formation that, in fact, something beyond just a small on-site or even off-site dry storage facility to take care of the relatively small amount of SNF that Dairyland has, that would be the direct consequence of the breach. The issue is whether, in addition to that, DOE should have foreseen that there would be this investment in what is supposed to be a massive undertaking to take care of the whole industry- Well, it doesn't seem to me that far-fetched. And I think that's what the court of claims thought, that Dairyland's a very small player in this broader universe and that they might well seek to partner with other utilities to get some, you know, sufficient space. I mean, there's a massive undertaking and there's construction. So is that your point, that that was not foreseeable, that they would be partnering with other utilities to try to get some storage space? Not beyond, certainly not to purchase something that has 100 times the necessary storage that Dairyland needs. The shares that it has are 100 times beyond what it actually needs for its SNF. Well, but that's another issue, isn't it? I mean, that's why I started to ask you about whether or not this was an unjust enrichment problem in terms of the amount. I mean, it seems to me your argument is that the amount that they invested was far beyond what was necessary for the amount of waste they wanted to store, right? That's certainly part of it, yes, Your Honor. But, I mean, we also have, as a part of the trial, the court also awarded to Dairyland damages for its investigation of the dry storage facility that it intends to construct. So in addition, and now it has not yet constructed a dry storage facility on its site, but it's planning to do that, and we presume that those damages will be in the next round, the next damages suit from Dairyland. So in essence, what the government is going to be asked to do is to pay for this on-site dry storage facility and this investment in this massive facility. Well, I don't care what they ask the government to do. The question isn't whether or not they're going to ask for more, and the question is whether or not they're entitled to more. So I don't think you can win your argument by suggesting they're going to keep asking for more and more duplicative recoveries, and that doesn't really help us. Let me just ask you, if it's an unjust enrichment, though, if it's really, it seems to me you're arguing that it was way too much of a huge investment given what was necessary to take care of their piece of the pie, right? Doesn't the government have the burden, then, to come in and give us the number in terms of what the unjust enrichment is? In other words, to what extent this exceeded, the amount they invested here exceeded what would have been necessary to cover their amount? Well, in Indiana, Michigan, this court held that the foreseeability analysis, the burden is upon the plaintiff to prove foreseeability. And that includes not only the type of costs that are incurred, but also the scope of the costs, that the government couldn't foresee this massive type of investment, that that would be a foreseeability problem, and that the plaintiff has an obligation to prove that the government should have foreseen both the scope and the type of costs at the time of contract formation that are being asked to be paid. What if it were the case that in order to get into this partnership, there was a minimum investment required, and that minimum investment was the 11% or the 13% or whatever it was that Dairyland put in? Even though they're only taking away six casks in terms of what's necessary, would that be the kind of sufficient proof that would be put forward? Well, beyond the fact that we don't have that evidence in this case, Your Honor, I don't think so. I mean, here, I mean, we also look at what is the direct, what would be foreseeable at the time of contract award? Foreseeable would be a small storage facility that would hold six casks. What kind of costs would those entail? That's what the government could foresee. The idea that there would be, oh, well, we'll also have a consortium to create a nationalized program, and the types of massive investments that we need to not only put ours in there, I mean, at a certain point, then, it becomes unreasonable to think the government should foresee that there would be massive costs to store these six casks when a small storage facility either onsite or nearby would do. That's the type of foreseeability analysis that really the court under Indian Michigan seems to require be undertaken. But what would happen if, in fact, the small amount of spent fuel could be stored in a smaller facility, but no such small facility was available at Dairyland, and they had to participate in a larger facility? Well, the foreseeability issue would mandate probably to the smaller facility. However, the circumstances would only require you to be able to participate in a larger facility. Well, there would need to be evidence, though, that that type of information was available to the government at the time of confirmation. The Supreme Court in globe refining has talked about that foreseeability isn't just a mamorphous concept. It is where there's something beyond just the direct result, the cost you would directly anticipate. This is spent nuclear fuel. There aren't going to be a lot of options, are there? You're going to have probably play with the big boys or nothing. Or build your own dry storage facility, which is what Dairyland is now anticipating doing in the next damages case. But, of course, they have to do something immediately, because you didn't pick it up. They have to put it somewhere. Why not this go into a partnership with the bigger facility? Well, it's also, you know- That seems very reasonable and foreseeable under the circumstances. Well, as the trial record also establishes, and as this court recognized in Indiana, Michigan, this project is the same project that was issued in Indiana, Michigan. It's highly speculative. It's very unclear whether it will ever get off the ground in terms of an actual construction and opening date. There's lots of lawsuits about it. There's lots of opposition to it. This type of speculative investment, which does have a profit motive, and I should also point out the trial court here didn't actually credit- It didn't say it had no value. But under the Third Circuit's decision, Solon Butcher, unless the court could find the investment is worthless, and there was testimony, Joint Appendix 610, that it, in fact, doesn't have a zero value, the trial court has to at least credit the value of the investment against what- The government can't just pay the whole investment, and then- Can I just ask you to repeat? You started off. What are the other cases? We haven't decided. We don't have a pending case involving investment in PFS, right? Yes. We do have a pending- PG&E, and argued Lesmoth in northern states, which will be argued this afternoon. I see I'm way into my rebuttal time. Thank you, Your Honor. I'll save the rest. Thank you, Mr. Lester. Mr. Shapiro? You please the court. I want to first address the PFS issue that Mr. Lester led with. It's important to remember that this case was carefully considered by the trial court, and we're talking about a clearly erroneous standard of review on the PFS issue. Foreseeability is a question of fact. The trial court carefully considered that issue, mentioned a number of the concerns that the members of this court have articulated here, that for Derek- Even if it was foreseeable, what justifies the amount? Doesn't there have to be a relationship? I mean, even if it was foreseeable that they would partner with these other utilities to try to get something off the ground, wouldn't the amount that they get have to be proportionate to the six casks that they're going to actually need to use for storage? Yes, I think, Your Honor, your question goes to, was this reasonable mitigation on Dairylands Park? We're talking about an $11 million investment in PFS for a utility that was incurring in the neighborhood, and has been incurring in the neighborhood, of $4 million per year to store the spent fuel in wet storage. When it made its initial investment in PFS, Dairyland was looking at the likelihood it felt that it was not going to be able to develop dry storage on-site, and there was testimony credited by the trial court that now Dairyland understands there might be more flexibility, but to develop an on-site dry storage facility on its own, Dairyland was looking at costs that were much, much greater than $11 million. It was looking at $50 to $100 million. Yeah, but my question goes to, their buy-in was 13.5%, which, as I understand, is equivalent to an ownership of several hundred casks, whereas the amount that they had would only need six casks. So it's not whether or not getting into this partnership was a foreseeable matter, but whether or not the extent to which the amount of the investment was beyond what they would need for their particular storage needs. Well, first of all, let me address, I think, a question that you posed to Mr. Lester earlier, and I don't believe his answer was correct, which is, did Dairyland invest more than the minimum amount that it could have invested? And there was testimony in this point from Mr. Parkin in the trial court that Dairyland invested the minimum amount, the utilities that were, in order to maintain its participation in PFS. Did the district court make a finding, an actual finding in that regard? I don't recall. I don't believe that the trial court got to that point, and I think it's perhaps in part that our discussion on foreseeability, Your Honor, is getting awfully specific as to how specific did Dairyland's mitigation have to be to the government. Looking at this court's ruling in SMUD, I think a correct ruling that foreseeability does not require the government to have foreseen that Dairyland would invest in something like PFS and exactly how large its share might be. What was necessary was the government would have to anticipate that Dairyland would have to incur expenses to store its spent fuel if the government breached, and that's all PFS is. Mr. Shapiro, if in fact the spent fuel that the government was looking at was six rods, let's say, let's assume that for a moment, but Dairyland then went out and bought itself the capacity to store 100 rods, is that foreseeable in type of damages? That's not what we're talking about. It would not be. What we're talking about foreseeability is to the amount of damages that the government would be at least looking at in the event of a breach. Yeah, Judge Garza, two slightly different concepts. One is could the government have anticipated expenses of the scope that Dairyland has incurred? The other goes to, again, I think it's really more a reasonableness concern. Did Dairyland incur more costs than it needed to to pursue the mitigation? On the could the government have foreseen that the cost that Dairyland would incur would be in the $11 million territory? The cost actually, the record shows that the government itself looked at interim storage and was looking at costs on a per metric ton basis that were in excess of that, and this is right at the time of contracting. So in terms of anticipating the foreseeability of the magnitude of the damages, the record indicates that the magnitude was foreseeable. And, again, I think it's a misunderstanding to say that Dairyland has gathered ownership of hundreds of, the right to dispose of 100 or more casts or canisters at PFS. Its ownership share might be that large, but the rules of PFS, as explained in the record by Mr. Parkin, are clear that if Dairyland or any participant in PFS doesn't need the shares, doesn't need access to the slots that it has, that those do not belong to Dairyland. They go back to PFS as a whole. And has Dairyland paid for those? Dairyland has not paid for casts. What Dairyland has paid is for the- which Dairyland does not use. Would it be paid when somebody else uses that storage space? Yes. It's also in the record the expectation that if PFS actually comes to fruition, the expectation is that there are going to be many other participants, many other utilities participating in PFS, and under PFS's structure, then Dairyland's ownership share is going to drop considerably. So it's not going to end up owning 13% of PFS. Other participants will come in, and it will essentially dilute Dairyland's share. Mr. Shapiro, Mr. Lester started with the point about whether Genoa was a separate corporate element and therefore different, and I think I asked him the question is whether that was required by Wisconsin law, and at least in Judge Damich's opinion, he said it was. What is the actual situation here? I don't believe it's required by Wisconsin law. Judge Damich was wrong on that point when he said Dairyland set up GFT because Wisconsin law required it to do so. I think that was a misunderstanding. I think GFT is a Wisconsin corporation. Dairyland presented evidence to explain why- He said the reason it was necessary was because they were engaging in something other than electricity generating activities, and therefore they had to have a separate corporation. They thought it would be clearer and cleaner that way. I don't believe Dairyland presented evidence and intended to say that it had absolutely no choice but to create a separate corporation. I don't want the court to have that misunderstanding, but Dairyland did present evidence that GFT was a reasonable way for Dairyland to have participated in PFS given its corporate structure, given the tax issues, given potential liability issues. Importantly, the trial court, and this was actually in its published decision denying the government's motion for summary judgment, the trial court explained this is really a red herring. Dairyland is not seeking compensation for GFT's participation in PFS. Dairyland is seeking compensation for its own money that is out the door. The trial court said, and it's at page 48 of the joint appendix, that it had no trouble following the money. This is Dairyland's money that's been invested in PFS. No one else's. There's no piercing a corporate bail issue here. There's no corporate structure here. This is Dairyland seeking compensation for the money that it has expended. I also want to get to the- It was not mandatory for them to set up a separate sub. They could have done a direct investment. They could have invested directly, and the trial court noted, and I think Judge Rader recognized this, the trial court said that given that if Dairyland had sought the expenses of setting up GFT, he would have been disinclined to have awarded those. As it turned out, Dairyland did not seek compensation for those costs. They were minimal. The only cost that Dairyland is seeking, the only cost the trial court awarded, are for the actual participation costs. Is the investment in the company, in the sub? It's the cost of participation in PFS. There are no other funds. There's no other purpose for GFT. It's a single-purpose entity. There's no slush fund within GFT. All of the money that Dairyland has expended has gone to supporting PFS. But you pointed out before that if, in fact, Dairyland does not use up all of its quota for storage, that that could be used by somebody else. That's in PFS itself, yes. And Dairyland would be paid for that. If PFS is successful, Dairyland might, in the future, get some compensation back. They would be paid for it if, in fact, there was excess storage that was not used by Dairyland. Dairyland would hope so as a participant in PFS. And this, I think, goes to the unjust enrichment point. As the trial court recognized, this is a case for partial breach of contract. There certainly has been no showing up to this point. And this is a finding of fact in the trial court's opinion. There's been no showing at this point that Dairyland has been enriched at all. PFS has not been successful. Like the government's own Yucca Mountain program, it faces a host of hurdles it would have to get through. It is possible that out in the future, maybe Dairyland might get some compensation. That is something that can be addressed at this time. But on the record and based upon the trial court's findings, there certainly has been no unjust enrichment. There's no fallback provision then on the part of the government to get that unjust enrichment amount back. Not that I'm aware of, Your Honor. I want to take a couple moments to get to the exchanges issue, and particularly Dairyland's cross-appeal on the exchanges issue. We have two legal arguments and one factual argument that I want to emphasize this morning. Legally, based upon this court's ruling in Carolina Power and Light, the better rule would be to consider exchange costs after Dairyland has actually delivered spent fuel to the government and incurred whatever exchange costs it will incur in the future so that Dairyland and the trial court has the benefit of actual experience before determining what a non-breach world exchange cost might have been. This is really entirely consistent with what the trial court did in Carolina Power and Light concerning non-breach loading costs to spend fuel as was approved by this court. Second legal issue, and I think actually the second legal issue also impacted the trial court's error of fact, is that the trial court undeniably relied upon an inapplicable rate of acceptance in assessing Dairyland's cost of exchanges. The trial court judge, Damage, looked at the evidence and said the cost of exchanges under the evidence presented by Mr. Graves could vary widely, could go as high as $21 million. There is no dispute that you only get up to high exchange costs like that under Mr. Graves' analysis under the inapplicable 1991 annual capacity report rate ramping up to only 900 MTU. Mr. Graves' undisputed testimony is that under the applicable acceptance rate, you're talking about a very narrow range of exchange costs that are entirely not applicable to the trial court's analysis. And I think that led the trial court astray when it then considered the testimony of the two experts who actually agreed on the basics of analyzing exchange costs. And this is why we think this is clearly erroneous. This is not a matter of the trial court making a credibility determination of two experts saying different things. The experts actually said the same thing. They said that the—this is Dr. Neuberger, the governance expert— said that the traditional economic result is that you would expect what's called the marginal bid price to prevail. And that's what Mr. Graves said. Now, Mr. Neuberger, Dr. Neuberger, did say that he thought it was possible that if the number of participants got low enough, it's possible that maybe a different price could prevail. But Dr. Neuberger never explored that possibility. He said if you have a different structure, if you have a small enough number of players, it's possible that you could have a different result. He never explored that issue. Mr. Graves did. He's the only one that did. And his testimony, his presentation was undisputed. He looked at all the factors that might cause a price other than marginal bid price to prevail. He looked at possibility for segmentation. He looked at the possibility that there were too few players. And he found that they were not present. Are you going to consume all your time? I think I'm actually wrapping up, Your Honor. So, accordingly, the trial court's ruling in this regard was clearly a remnant. Thank you. Mr. Lester, you have two and a half minutes. First of all, with the PFS issue, the court asked about the 13.5 percent investment. Even if you had to invest at that level to obtain equity shares in PFS, there was nothing to preclude Dairyland and others from participating as a customer. There was no need to invest as an equity shareholder in this venture. And that high investment was not foreseeable. Well, how are we going to calculate what a customer would pay? That would be something that— That would be really rough, right? Well, I cannot profess right now to be an expert on exactly what information PFS has provided to folks about how they're going to structure costs and things. But, I mean, that certainly is something that the industry has information about that could have been presented. And certainly there's no need to then— But when you have only a necessary six casts to invest for 100 times what you need, and then at page Joint Appendix 466 to be able to obtain the profits from a 13.5 percent equity investment, which that Joint Appendix site talks about how the profits would be distributed to the equity shareholders, that's not something that— There was no evidence that that should have been foreseeable to the government at the time of contract award. With regard to— And just to correct one statement one of the judges made, specifically it was GFT's investment in PFS rather than Dairyland's investment in GFT that the trial court awarded damages on. Specifically, Dairyland did not seek to recover the lost value of its shares. Instead, it sought to recover the value of GFT's investment in PFS. And with regard to the exchanges issue regarding the offset, before the court gets to that issue it would have to look at the government's argument about the model that was used here, that was argued last month in PG&E, and whether or not a court can rely upon an expert model that is based wholly upon the—mostly upon the expert's suppositions without actually talking to anyone in the industry, all kinds of assumptions about what DOE would do, what approvals it would make, when it would disapprove, whether it would or could accept failed fuel, how the industry individuals would react to political opposition and things like that, that are all based upon his own supposition without any factual support in the record, without any investigation or discussion with specific utilities to see, in fact, or empirical studies to see what the utilities in reality would do. For these reasons, we'd ask the court to reverse the trial court on the specific issues that we have appealed. Thank you, Mr. Lester. Piero, you have just a few seconds. Yes, I want to address Mr. Lester's last point with respect to exchanges. In fact, Mr. Graves did empirically address the extent to which there would have been incentives for utilities to have engaged in exchanges. This is the same sort of analysis that this court approved in energy capital. There is no need, as there was not in energy capital, for Mr. Graves to have engaged in some different analysis to have interviewed prospective market participants. Thank you, Mr. Piero. Our last argument today is Celsus and Vietnam.